UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| MONICA CURRIER, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL O. LEAVITT,[1] Secretary of )<br>the United States Department of Health )<br>and Human Services )<br>)<br>Defendant. ) | Civil No. 06-118-B-W |

**ORDER ON PLAINTIFF'S MOTION FOR JUDGMENT AND
DEFENDANT'S CROSS MOTION FOR JUDGMENT**

For nearly a decade, Monica Currier, who suffers from macular degeneration, has been asking Medicare to reimburse her for the purchase of a video magnifier (VM), a device prescribed by her physician that allows her to read. Concluding that the VM fits within the definition of durable medical equipment (DME) and that reimbursement is long overdue, the Court reverses the Medicare Appeals Council's denial of reimbursement.

**I. STATEMENT OF FACTS**

On December 17, 1997, pursuant to her doctor's prescription, Monica Currier purchased her VM[2] for $2,436.00 to aid her eyesight.[3] Administrative Record at 89 (AR).[4]

---

[1] Ms. Currier originally filed this action against then Secretary Tommy G. Thompson. In accordance with Rule 25(d), the Court has *sua sponte* amended the Complaint to substitute the current Secretary Michael O. Leavitt as the named defendant. Fed. R. Civ. P. 25(d).

[2] The parties use different terms to describe the same device. Ms. Currier calls it a Video Magnifier; the Secretary refers to it as a Closed Circuit Television (CCTV). In its earlier opinion, the Court used the term video magnifier and does so again. *See infra* Part II.A.1.c. The VM uses a camera and a video monitor, among other component parts, to drastically enlarge text. Ms. Currier's VM has a magnification capacity of "50X" and reverses the colors of an image so that print appears as white text on a black background. *Pl.'s Mot. for J. on the Stipulated Admin. R*. at 3 (Docket # 9) (*Pl.'s Mot*.).

Since then, Ms. Currier has been seeking reimbursement from Medicare and this Order addresses the latest and final installment in Medicare's denial of her request for reimbursement.

After purchasing the VM, Ms. Currier submitted a bill to Medicare for reimbursement. The Medicare insurer denied her claim on initial review and on reconsideration. *See Currier v. Thompson*, 369 F. Supp. 2d 65, 66 (D. Me. 2005);[5] AR at 89-90, 105. She then requested, and received, a hearing before an Administrative Law Judge (ALJ) on January 16, 2001. AR at 127-75. On October 26, 2001, ALJ Lieb concluded that the VM was not reimbursable under Medicare because it was not customarily used for a medical purpose and did not meet the definition of prosthetic device. AR at 50-54. Ms. Currier appealed ALJ Lieb's determination to the Medicare Appeals Council which concluded that the VM was not covered by Medicare because it fell within the statutory exclusion for eyeglasses.[6] AR at 11-18. The Appeals Council's decision became final and subject to judicial review on March 30, 2004. AR at 3-8. On May 11, 2005, this Court

---

[3] The Appeals Council decision explains that the VM actually cost $3,045.00, but that Medicare would only pay for "eighty percent of the lesser of the actual charge or the amount due under any applicable fee schedule." AR at 4-1.

[4] The parties filed a paper version of the Administrative Record. Its pagination runs from 1-1 through 50-1 and then begins at 1 and runs through 175.

[5] The Court's May 11, 2005 Order more thoroughly chronicles Ms. Currier's saga, describing the factual background for her claim and detailing her multiple requests for reimbursement and Medicare's corresponding denials. *See Currier v. Thompson*, 369 F. Supp. 2d 65, 65-67 (D. Me. 2005).

[6] The Medicare Act, 42 U.S.C. §§ 1395 *et seq*., expressly excludes coverage for specific items. The statute reads:

> Notwithstanding any other provision of this title [42 USC §§ 1395 et seq.], no payment may be made . . . for any expenses incurred for items or services – where such expenses are for routine physical checkups, *eyeglasses* (other than eyewear described in section 1861(s)(8) [42 USC § 1395x(s)(8)]) or eye examinations for the purpose of prescribing, fitting, or changing eyeglasses, procedures performed (during the course of any eye examination) to determine the refractive state of the eyes . . . .

42 U.S.C. § 1395y(a)(7) (emphasis added).

concluded that the VM did not fall within the "eyeglasses" statutory exclusion and remanded the matter to the Secretary for further proceedings. AR at 37-1-50-1.

On July 28, 2006, the Appeals Council again denied Ms. Currier's request for reimbursement, because it concluded that the VM was neither DME nor a prosthetic device. AR at 1-1-24-1. She now seeks to have the decision of the Appeals Council reversed and the Secretary seeks to have it affirmed. *Pl.'s Mot.*; *Def.'s Mot. for J. on the Stipulated Admin. R.* (Docket # 13) (*Def.'s Mot.*).

## II. DISCUSSION

The Medicare Act provides coverage for "medical and other health services." 42 U.S.C. § 1395k(a)(1). The Act defines "[m]edical and other health services" to include "durable medical equipment" and "prosthetic devices." 42 U.S.C. §1395x(s)(6), (8). The question is whether Ms. Currier's VM constitutes either DME or a prosthetic device, making it reimbursable under Medicare.

### A. Durable Medical Equipment

As the Court of Appeal of California observed, "[o]ddly enough, neither [the Act][7] nor its accompanying . . . regulations, specifically define the critical term, 'durable medical equipment,' although [the statute includes] a nonexclusive statutory list of representative medical equipment . . . ." *Blue v. Bonta*, 99 Cal. App. 4th 980, 986 (Cal. Ct. App. 2002). The statute provides as examples:

> iron lungs, oxygen tents, hospital beds, and wheelchairs (which may include a power-operated vehicle that may be appropriately used as a wheelchair, but only where the use of

---

[7] The California Court of Appeals was addressing the Medicaid statutory and regulatory definition of "durable medical equipment." The California statute requires that "'[d]urable medical equipment,' be covered by the California Medi-Cal program." *Blue v. Bonta*, 99 Cal. App. 4th 980, 987 (Cal. Ct. App. 2002). California has also generally defined the term by regulation, which essentially tracks the federal regulatory definition. *Id.* at 986-87.

> such a vehicle is determined to be necessary on the basis of the individual's medical and physical condition and the vehicle meets such safety requirements as the Secretary may prescribe) used in the patient's home. . . .

42 U.S.C. § 1395x(n).

The regulatory definition of DME "focuses not on examples, but rather on qualitative criteria, including the equipment's durability . . . ." *Warder v. Shalala*, 149 F.3d 73, 76 (1st Cir. 1998). Medicare regulations define DME as equipment that: (1) can withstand repeated use; (2) is primarily and customarily used to serve a medical purpose; (3) generally is not useful to an individual in the absence of an illness or injury; and (4) is appropriate for use in the home." 42 C.F.R. § 414.202. Here, the parties agree that the VM can withstand repeated use and that it is appropriate for use in the home. *Pl.'s Mot*. at 5; *Def.'s Mot*. at 9-10. The only contested issues are whether the VM is primarily and customarily used to serve a medical purpose and whether it is generally not useful to an individual in the absence of an illness or injury.

### 1. Primarily and Customarily Used to Serve a Medical Purpose

#### a. Ms. Currier's Contentions

Ms. Currier first argues that the VM is used to serve a medical purpose. In the absence of an express statutory definition of "medical purpose," Ms. Currier references the Merriam Webster Dictionary definition of "medical" as "1: of, relating to, or concerned with physicians or the practice of medicine or 2: requiring or devoted to medical treatment." *Pl.'s Mot*. at 5. Ms. Currier points out that macular degeneration is a medical condition for which she receives treatment from a physician, citing her physician's prescription for the VM.[8] *Id*.

---

[8] Her physician's note reads: "There is currently no therapy that will significantly improve your vision. I have therefore recommended a visual magnifier be used for [various] visual tasks essential to daily living. Enclosed

at 6; *see also* AR at 125-126. Ms. Currier argues that the VM is unquestionably used to "serve a medical purpose," as her treating physician prescribed it as medically necessary. *Pl.'s Mot.* at 6.

Ms. Currier next argues that the VM is "primarily and customarily used" to serve a medical purpose. The affidavit of the Marketing Programs Manager for the VM manufacturer states that it was "designed specifically to meet the needs and expectations of low vision users, that the product would have no utility for members of the general public who are not visually impaired, and that the market for the product consisted of individuals who are visually impaired to the point where eyeglasses are not sufficient to enable them to meet a large portion of visual needs." *Id*. at 6-7; AR at 29-30. Ms. Currier has repeatedly emphasized that she uses the VM exclusively to aid her vision. *Pl.'s Mot.* at 6-7.

Moreover, Ms. Currier strongly disputes the Appeals Council's approach to the "primarily and customarily" criterion, claiming that the Appeals Council seeks to change the standard. She states:

> In its decision, the Council argues that [] the constituent parts of a VM could, theoretically, be used to build other devices with uses that go beyond a medical purpose. In particular, the Council argues that since the components of a VM, including a camera, cable, and screen, has been used together in security and surveillance systems and in microfiche and microfilm readers that the primary and customary use of the VM is non-medical. If the Council's standard were applied to other items considered DME, such as oxygen tents and wheelchairs, then those items would also be excluded from the definition of DME.

*Pl.'s Mot*. at 7-8 (citations omitted).

### b. The Appeals Council Decision

---

is a prescription for a visual magnifier. This is a medically necessary device to assist you with your vision." AR at 126.

The Secretary argues that the Appeals Council reasonably determined that Ms. Currier's VM is not DME.  After reviewing the procedural, factual, and regulatory backdrop of this case, the Appeals Council discussed whether the VM met the requirement that a DME be "primarily and customarily used to serve a medical purpose." 42 C.F.R. § 414.202; AR at 13-1.  Noting that the regulations give "little or no information on the meaning of the regulatory standards for DME coverage, including the term, "medical purpose," the Appeals Council went on to review the definition of "low vision."  AR at 13-1.  Lastly, it focused on the nature of this device, describing it as a "closed circuit television."  *Id.*  Analyzing the dictionary definition of "closed circuit television," the Appeals Council cited the "Encyclopedia of TV" which observed that "a closed circuit television system has 'many industrial and scientific applications', but its primary use has been in security and surveillance camera systems."  *Id.* at 13-1-14-1 (quoting McCarthy, *Closed Circuit Television* at http://www.museum.tv/archives/etv/C/htmlC/closedcircui/closedcircui.htm (July 6, 2006).  The Appeals Council traced the origins of the closed circuit television to the 1930s.  AR at 14-1.  Noting that the components of the VM are "basically the same as the components of closed circuit television systems used for security and surveillance, as well as other applications, such as microfiche and microfilm readers in libraries," the Appeals Council concluded that "a magnifying camera and television monitor configured for use by and marketed to the visually impaired does not transform the 'primary and customary use' of that system into a 'medical purpose' . . . ."  *Id.*

### c.  Discussion

Under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), a court must confront two questions in reviewing an agency's construction of the

6

statute it administers: (1) whether Congress has directly spoken to the precise question at issue; and, (2) if not, whether the agency's answer is based on a permissible construction of the statute. 467 U.S. at 842-43. If the statute is silent, a court "does not simply impose its own construction on the statute . . . ." *Id.* at 843. A court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n.11.

The Secretary concedes that the statute is silent. *Def.'s Mot.* at 6. It points out that in applying the second prong of the *Chevron* analysis, "a court must give 'considerable weight' to the agency's interpretation of the statute." *Id.* (quoting *Chevron*, 467 U.S. at 844). Further, "substantial deference" must be accorded "an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). In *Thomas Jefferson University*, the Supreme Court wrote that "broad deference is all the more warranted when, as here, the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Id.* at 512 (internal punctuation and citation omitted); *see also South Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 97 (1st Cir. 2002); *Warder*, 149 F.3d at 84 ("[T]he classification of medical equipment for [Medicare] reimbursement purposes is the sort of technical question that generally benefits from [the agency's] expertise and experience.").

Here, despite the deference the Court must accord the Appeals Council's interpretation, it cannot conclude that it was reasonable. There are serious problems with

each of the Secretary's primary arguments supporting the conclusion that the VM is not primarily and customarily used to serve a medical purpose.

The first problem is definitional. The Appeals Council's decision begins with a seemingly innocuous footnote: "The record variously refers to this item by its acronym, CCTV, as a video magnifier (VM), or as a personal reader. This decision generally refers to the item as a closed circuit television system, except as required by the context." AR at 3-1 n.2. From its own editorial choice of one among a number of synonyms, however, the Appeals Council proceeds to base its decision on the definition of its chosen term, "closed circuit television." Its logic rests on a definitional syllogism: (1) major premise: the primary use of a closed circuit television is not to serve a medical purpose; (2) minor premise: this device is a closed circuit television; and, (3) conclusion: the primary use of this device is not to serve a medical purpose. Moreover, the Appeals Council seems to argue two mutually exclusive points: on the one hand, it suggests that the issue is merely semantic while, on the other hand, it suggests that there are substantive differences between the two devices. The Court is troubled by both lines of attack.

To the extent that this issue is only one of semantics, the Appeals Council may not bootstrap itself into a substantive argument by defining the issue away. Medicare reimbursement cannot depend on whether, as labeled, the device's name is sufficiently generic to be susceptible to apply to myriad non-medical uses. To allow nomenclature to trump the actual nature and use of the device would leave Medicare recipients unreimbursed for devices indisputably medical in nature.

Alternatively, to the extent there are significant differences between a closed circuit television system and a video magnifier, the Appeals Council should be applying the label of

8

the device *most* like the device used by Ms. Currier.[9] As the Appeals Council observes, a closed circuit television refers to a diverse assortment of devices; a video magnifier, by contrast, appears to refer only to the type of device at issue here; yet, the Appeals Council opted to deny reimbursement by analogizing to a device fairly unlike the one actually at issue. The Appeals Council cannot compel the conclusion that Ms. Currier's VM is not reimbursable because the relatively distinct device of a closed circuit television system might be unreimbursable.

Next, the Appeals Council argues that the component parts of the VM are "basically the same as the components of closed circuit television systems used for security and surveillance." AR at 14-1. Noting that the VM consists of a "magnification camera to transmit an image to a television set, where it can be adjusted to alter magnification, contrast, or reverse polarity," the Appeals Council concluded that "a magnifying camera and television monitor configured for use by and marketed to the visually impaired does not transform the 'primary and customary use' of that system into a 'medical purpose.'" *Id.*

The Court is again troubled by the Appeals Council's approach, as its logic would deny Medicare coverage to a host of medical equipment that would otherwise be unquestionably reimbursable. For example, a motorized wheelchair, which is included in the statute as an example of reimbursable DME, could be disassembled to constitute a motor, a

---

[9] As Ms. Currier states:
> Defendant's attempts to draw parallels between Ms. Currier's video magnifier ("VM") and closed-circuit televisions ("CCTVs") in general does not show that Ms. Currier's VM is not DME. . . . Although some CCTVs may be useful, for example, for surveillance at retail stores to catch unscrupulous patrons as they wander about the aisles, there is no evidence in the record that Plaintiff can somehow transform her VM into a CCTV system to, for example, monitor her home after she goes to bed or any other activity not directly related to assisting her with her macular degeneration.

*Pl.'s Unified Reply Br. and Statement of Opp'n to Def.'s Mot*. at 3 (Docket # 15) (*Pl.'s Resp*.).

9

chair, and wheels, each of which is primarily used to serve non-medical purposes; this does not make a motorized wheelchair non-reimbursable.

Similarly, it would be improper to conclude that originally non-medical devices subsequently reconfigured for the disabled are categorically excluded as DME. Contrary to the Secretary's intimation, it is precisely this subsequent reconfiguration that renders certain items DME. Therefore, although the Court agrees that reconfiguration does not automatically transform non-medical items into DME, neither does reconfiguration bar such items from constituting DME. The Court rejects the argument that the potential configurations and applications of the VM's component parts precludes the VM itself from constituting DME.

Finally, the Secretary urges the Court to reject Ms. Currier's "'apples and oranges' comparison of CCTV systems and wheelchairs" because unlike VMs, wheelchairs have been "standard equipment in hospitals, nursing homes, and other health care settings for many years." *Def.'s Mot.* at 12. The Secretary writes, "it is clear that wheelchairs primarily serve a medical purpose." *Id.* The Court rejects the implication that the relative infancy of the VM discourages its consideration as DME, while items with some longevity, such as wheelchairs, are more likely to constitute DME. As Ms. Currier states in her response, "[t]he premise that Congress only intended to cover DME that has been around for many years and has become part of the medical establishment is nowhere to be found in the statute or regulations." *Pl.'s Resp*. at 3. Further, such a distinction would leave Medicare recipients frozen in time, unable

to take advantage of medical progress, since new technology by its nature cannot have been "standard equipment . . . for many years."[10]

### 2. Generally Not Useful in the Absence of an Illness or Injury

This inquiry goes hand-in-hand with whether the VM is primarily and customarily used to serve a medical purpose. Here, the parties refer to their earlier arguments: Ms. Currier re-emphasizes that the VM is manufactured and marketed for the sole purpose of assisting people with significant vision impairment and that there is nothing in the record to suggest that it would be useful to someone without an illness or injury. *Pl.'s Mot*. at 9. She disagrees with the Appeals Council's focus on whether some of the VM's component parts may be generally useful absent an illness or injury. *Id*. at 8.

The Secretary also returns to its earlier argument that the component parts of the VM have been shown to be generally useful in the absence of an illness or injury. The real nub of the Secretary's position, however, seems to rest on the possibility that, because someone else, not suffering from Ms. Currier's condition, could use the VM for a variety of purposes ranging from surveillance to reading microfiche, the VM is non-reimbursable. The Secretary says, "[m]oreover, although a person with normal vision would probably not 'purchase' plaintiff's system, he or she might find the system 'useful' for various purposes – e.g., reading recipes, stamp or coin collecting, handicraft work." *Def.'s Mot*. at 13.

The Court cannot conclude that the existence of some conceivable uses of the VM itself, unrelated to illness or injury, is tantamount to a *general* usefulness absent illness or injury. For example, because a healthy person can sleep in a hospital bed, this does not render a hospital bed unreimbursable to a patient who requires it for a medical condition.

---

[10] The Court acknowledges that the statutory list of DME has remained unchanged for years and includes at least one outmoded medical technology – the iron lung. *See* S. Mitchell Weitzman, *Legal and Policy Aspects of Home Care Coverage*, 1 ANNALS HEALTH L. 1, 10 (1992).

The Secretary's nod to select instances in which the VM may be of some assistance, including, for example, its usefulness to the stamp enthusiast, strains the plain meaning of the word "general." "Generally not useful" is distinct from positing imaginable uses for the VM absent an illness or injury. It seems implausible that a person who could read her mail, her prescriptions, or the newspaper without a VM would elect to place a document on a machine that magnifies the words to be fifty times larger and transposes the colors black and white. The fact that somewhere in the United States a philatelist could use a VM to inspect her stamps hardly seems a proper basis to deny Medicare reimbursement to the numerous, mostly elderly people in this Country suffering from macular degeneration.

Finally, there is no evidence in this record that Ms. Currier or anyone else actually used her VM for anything other than its intended purpose and there is certainly no evidence that Ms. Currier disassembled and reassembled her VM to construct some sort of home-surveillance unit. The record reflects, instead, that she is using her VM for reading the correct prescription on her medicine, instructions for physical therapy exercises, and telephone numbers for doctor's appointments. AR at 9-1. The Secretary's implicit concern – that the inclusion of VMs as reimbursable would lead to the inclusion of "all the necessities of life, and some of its amenities" under the guise of medical need – does not appear to obtain here. *See DeSario v. Thomas*, 139 F.3d 80, 90 (2d Cir. 1998).

Finding the Appeals Council's reasoning unconvincing, the question remains whether the VM constitutes DME under the statutory and regulatory framework. The California Appeals Court suggested a useful approach in *Blue v. Bonta*, saying: "The words of the statute are the starting point." 99 Cal. App. 4th at 988. After reciting the language of the statute and the regulation, *Blue* concluded, as does this Court, that the "language of the

relevant statutes and applicable regulations . . . discloses a clear intent to broadly cover all 'durable medical equipment' without any expressed limitation." *Id.* at 989. Next, *Blue* followed the interpretive mandate that "words used in a statute should be given the meaning they bear in ordinary use" and defined "medical," as used in DME, to mean "the treatment, cure, or alleviation of any health condition . . . ." *Id. Blue* pointed out that certain items enumerated as DME within the statute, such as the iron lung and wheelchair, do not "cure the underlying medical condition," but, instead, are prescribed to "alleviate the effects of the medical condition . . . ." *Id.* at 990. Comparing a stairway chair lift to a wheelchair, *Blue* noted that "a stairway chair lift restores mobility lost as a result of a medial condition or disability." *Id*. *Blue* went on: "Persons who do not suffer from a disabling medical condition or injury, and are able to climb stairs on their own . . . would not find installation of such a chair lift useful in negotiating stairways;" the Court ultimately concluded that the stairway chair lift qualified as a DME. *Id.*

Conversely, the definition of DME "establishes a rational distinction between equipment that is primarily medical in nature, and devices principally employed for non-medical purposes that might incidentally benefit someone with a particular condition." *DeSario*, 139 F.3d at 89.[11] As *DeSario* points out, the mere fact that a doctor has written a prescription for an item cannot by itself make it reimbursable under Medicare.[12] *Id*. at 90; *see also Hosking v. State Farm Mut. Auto. Ins. Co.*, 499 N.W.2d 436, 437 (Mich. Ct. App. 1993) ("We do not believe that [durable medical equipment] requires the insurer to pay for anything prescribed by a physician."). The definition of DME has "the added benefit of

---

[11] The Supreme Court vacated *DeSario* on other grounds. *Slekis v. Thomas*, 525 U.S. 1098 (1999).
[12] In *DeSario*, the physician prescribed as medically necessary "clear glass cookware and table dishes," "electric heaters," "all natural bedding," a "vacuum cleaner designed for allergic and chemically sensitive people," "organic food," and "bottled water in glass bottles." *DeSario*, 139 F.3d at 90.

13

guarding against moral hazard; after all, depending on how broad the range of a person's afflictions, plaintiffs' definition of DME would cover all the necessities of life, and some of its amenities." *DeSario,* 139 F.3d at 90. Thus, in *DeSario*, the Second Circuit upheld the denial of reimbursement for air conditioners, air purifiers, and roomsize humidifiers. *Id.*; *see also Dougherty v. Dep't of Human Servs.*, 449 A.2d 1235, 1238 (N.J. 1982) (upholding the denial of reimbursement for air conditioners and air humidifiers); *Hosking*, 499 N.W.2d at 437 (concluding that a van modified for a quadriplegic is not DME).

The Court accepts the *Blue* analysis regarding the words in the statute and the regulation as well as its definition of "medical." The Appeals Council argues that because the VM "does not improve the function of the macula [and] leaves the underlying disease process unaffected," it is not reimbursable. AR at 17-1. The Court rejects such a constrained view of the plain language of the law. As the statute includes an iron lung and a wheelchair, neither of which cure the underlying condition but only alleviate its symptoms, the fact that the VM does not cure, but only alleviates, the impact of Ms. Currier's macular degeneration does not bar reimbursement.

The Court finds that the VM purchased by Ms. Currier is primarily and customarily used to serve a medical purpose. It was prescribed to her by her treating physician as "medically necessary" to assist her with the ever-escalating deterioration of her eyesight. It is further apparent that Ms. Currier's sole use of the VM is to assist her vision and that the device has no use to her beyond her worsening medical condition. Finding that Ms. Currier is entitled to reimbursement for the VM as DME, the Court will not address whether the VM would also be reimbursable as a prosthetic device.

### B. Attorney's Fees

The Plaintiff's request for attorney's fees pursuant to 28 U.S.C. § 2412(b), (d)(1)(A) is premature. *See* 28 U.S.C. § 2412(d)(1)(B) ("A party seeking an award of fees . . . shall, within thirty days of final judgment in the action, submit to the court an application for fees . . . which shows that the party is a prevailing party and is eligible to receive an award under this subsection, and the amount sought . . . ."); *United States v. Eleven Vehicles*, 200 F.3d 203, 217 (3d Cir. 2000) ("The 30-day period for filing an EAJA attorneys fee claim does not begin to run until the time for filing a notice of appeal has expired.") (internal punctuation and citation omitted).

## III. CONCLUSION

The Court GRANTS Plaintiff's Motion for Judgment (Docket # 9) and REVERSES the Medicare Appeals Council's denial of reimbursement for the VM. The Court DENIES Defendant's Motion for Judgment (Docket # 13). The Court ORDERS judgment entered in favor of Plaintiff Monica Currier and against Defendant Michael O. Leavitt.[13]

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 21st day of May, 2007

---

[13] In granting the motion for judgment, rather than remanding the matter to the Secretary for an award of benefits, the Court is following what appears to be the preferred practice. *See Baker v. Sullivan*, 956 F.2d 234, 235 (11th Cir. 1992); *Martindale v. Sullivan*, 890 F.2d 410, 413 n.3 (11th Cir. 1989).